# IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

BRIDGESTONE/FIRESTONE       )
AMERICAS HOLDING, INC.,     )
                                )
      *Plaintiff and Counter-Defendant,*  )
v.                             )    No. 3:02-0994
                                )    Judge Nixon
UNITED STATES OF AMERICA,   )
                                )
      *Defendant and Counter-Plaintiff.*  )

## MEMORANDUM ORDER

This is a tax refund action brought by Bridgestone/Firestone Americas Holding, Inc.

("Bridgestone" or "Plaintiff") against the United States of America ("United States" or

"Defendant"), to which Defendant has filed a counterclaim, seeking further tax payments from

Plaintiff. A bench trial was held in this Court on April 12-13, 2005. Each party submitted their

proposed findings of fact and conclusions of law on July 18, 2005 (Doc. Nos 73, 74). In addition

to the ultimate issue, also pending before the Court are Plaintiff's motions in limine (Doc. Nos.

46, 48, 50, 52), filed with accompanying memoranda, to which Defendant responded (Doc. Nos.

58, 59, 63, 64, 75). A hearing was held on these motions on April 11, 2005. For the reasons

below, the Court DENIES Plaintiff's motions in limine and finds that Plaintiff has met its burden

of persuasion and therefore ENTERS JUDGMENT in favor of Plaintiff.

## I. BACKGROUND

Bridgestone sells and markets the Bridgestone Series L317, Size 12.00R24 tire ("the Tire"). The Tire is marketed and sold as part of a line of eight different size tires known as the L317 series, all tires for use in the coal, lumber, and oil-rigging industries. Federal law provides for a federal excise tax to be imposed "on tires of the type used on highway vehicles, if wholly or in part made of rubber, sold by the manufacturer, producer or importer . . . ." 26 U.S.C. § 4071(a). Bridgestone treats all of the L317 series tires as subject to this federal excise tax, except the Tire, which it contends is strictly for off-highway usage.

The Internal Revenue Service ("IRS") first challenged the taxability of the Tire for the audit period 1990-1994. In early 1995, IRS agents met with Bridgestone representatives, including David Seele ("Seele"), Bridgestone's Controller of Tax, concerning the Tire. According to Seele, in that meeting the IRS expressed some concern that because there was a Department of Transportation ("D.O.T.") mark on the sidewall of the Tire, it was a tire of the type used on highway vehicles and thereby subject to the federal excise tax. Nothwithstanding this concern, within weeks of that meeting, the IRS advised Bridgestone that the Tire was exempt from the excise tax and was not subject to an excise tax during the 1990-1994 audit period. Also after that meeting, Steele recommended that Bridgestone change the sidewall markings and clarify the marketing literature to ensure that the Tire could not be used on the highway. The D.O.T. mark was removed, a "Not For Highway Service" ("NHS") mark was added, and the marketing literature was updated to indicate that the Tire was intended for off-road use only.

-2-

Subsequently, now retired Kentucky Vehicle Enforcement Officer Charles Green ("Green"), through routine traffic stops and safety inspections of coal trucks, noticed that several coal trucking companies were using a tire stamped with NHS mark on the public highways in Eastern Kentucky. Green began an investigation and contacted Perry County Tire, a tire distributorship in Hazard, Kentucky, who informed him that because the tire was stamped with a NHS mark, it was not subject to the excise tax. Green began telling drivers that they needed to put highway tires on their trucks, and some of the truck owners told him that they purchased the tires because the tires were a great deal cheaper than other brands. Green informed Chuck Scoville ("Scoville"), an IRS Dyed Diesel Compliance Officer with whom he had worked in the past, of the tire issue. This resulted in an investigation by the IRS.

In late 1997, Seele was informed that the Tire was subject to another taxability challenge by the IRS for the tax period 1995-2000. Seele met with IRS agents again concerning the Tire and provided the IRS with additional information about the Tire. In 1999, the IRS issued a report that included proposed tax adjustments on the Tire for the four quarters of 1995, 1996, 1997, 1998, and 1999, and the first quarter of 2000, in the total amount of $1,649,719, plus statutory interest. The IRS estimated that the total tax due for these quarters would be $2,185,330.

Bridgestone submitted a Memorandum of Protested Adjustments in November 2001 taking issue with the IRS proposed adjustments. Defendant issued a deficiency notice to Bridgestone stating that it owed $92,792.83 in taxes and interest on sales of 8,477 tires sold in the first quarter of 1996. Bridgestone paid this amount, and on February 22, 2002, timely filed a Claim for Refund for this amount. The IRS responded by letter, fully disallowing the refund

-3-

claim. Bridgestone then brought this action, seeking a refund of the $92,792.83. Defendant asserted a counterclaim seeking $1,591,378 in excise taxes for the first through fourth quarters of 1995, the second through fourth quarters of 1996, each of the four quarters of 1997, 1998, and 1999, and the first quarter of 2000. Defendant also seeks statutory interest, penalties, and additions accruing on the $1,591,378 since November 12, 2001.

In a Memorandum Order entered August 24, 2004 ("August 2004 Order"), this Court denied Plaintiff's motion for summary judgment. The Court found that there existed genuine issues of material fact concerning (1) the Tire's actual use or function, including the extent of the Tire's use in ongoing coal operations and the Tire's ratio of on-highway use to off-highway use; and (2) the Tire's design, including the significance of certain sidewall markings on the Tire and the import of the Tire's 50 miles per hour ("mph") speed restriction.

## II. Motions in Limine

Plaintiff filed four motions in limine seeking to exclude certain of the Government's testimony from the trial. The Court reserved ruling on these motions, and the Government presented the testimony. After consideration, and for the reasons below, each of Plaintiff's motions in limine is DENIED.

### A. Federal Excise Taxes Collected on Other Tires

Bridgestone seeks to exclude evidence that refers to the tax status of similar tires manufactured by its competitors, specifically the Goodyear G177 and Michelin XDL ("Competing Tires"). Bridgestone seeks to exclude the Goodyear and Michelin 2001 "price

Case 3:02-cv-00994   Document 77   Filed 03/22/06   Page 4 of 36 PageID #: 197

books," which indicate that a federal excise tax was charged on the tires during the year 2001. Plaintiff contends that whether competing tires were charged an excise tax in 2001 is irrelevant to whether the Tire should have been charged an excise tax for the period of 1995-2000.

Plaintiff further contends that it relied on Defendant's representation during discovery that it would not disclose whether other companies paid excise taxes on the Competing Tires during the audit periods of 1995-2000 because the taxation of a non-party corporation is non-discoverable, confidential return information under 26 U.S.C. § 6103(a). Bridgestone asserts that relying on this representation, it did not seek further discovery on this issue. Defendant responds that it seeks to offer this evidence to demonstrate that the Competing Tires have similar design features and uses as the Tire, and not for the purposes of showing that the Competing Tires were subject to the excise tax.

The Court finds the fact that the Competing Tires are subject to the excise tax would tend to show that the Tire's design and tire features also make it subject to the tax. Importantly, there is no evidence that either the Tire or the Competing Tires changed in use or design between the audit period of 1995-2000 and 2001, the year the price books were issued. The Court finds that the evidence is relevant. Plaintiff's motion is DENIED and the evidence will be admitted and considered.

## B. Commercial Vehicle Safety Alliance Out-of-Service Inspection Criteria

Also on grounds of relevance, Bridgestone seeks to exclude the Commercial Vehicle Safety Alliance's "Out of Service" tire inspection criteria ("CVSA criteria"). The CVSA, a non-governmental, nonprofit organization made up of members of National Highway Safety Traffic

and State highway safety enforcement personnel has promulgated safety criteria utilized by the Federal Motor Carriers Administration enforcement personnel in inspecting highway vehicles and applies to inspecting tires on the vehicles. Under the CVSA criteria, a regulation prohibiting tires marked for non-highway service from traveling on the highway applies only to tires mounted on the steering (front) axle of the vehicle, not to tires mounted on the drive (rear) axle of the vehicle. Bridgestone argues that the CVSA criteria contradicts a 2004 amendment to the tax code pursuant to the American Job Creation Act of 2004, P.L. 108-357, § 869 amending 26 U.S.C. § 4072. Under the amendment, a "taxable tire" is any tire made of rubber "and if marked pursuant to federal regulations for highway use."

Whatever contradiction exists between the CVSA criteria and the code amendment is irrelevant because the latter was not in effect from 1995-2000, the tax years at issue, as Congress explicitly stated that the amendment only applied to sales of tires made thirty days after enactment. See 26 U.S.C. § 4072. Defendant asserts that the CVSA criteria bears on the ultimate issue, whether the Tire is of the type used on highway vehicles. Thus, because the Court finds that the tax amendment was not in effect until 2004, it has no bearing on the case and Plaintiff's motion is DENIED and the evidence will be admitted and considered.

### C. Expert Testimony

Finally, Plaintiff seeks to exclude the testimony of Defendant's two expert witnesses, Richard A. Kraft ("Kraft") and Jerry G. Pigman ("Pigman"). The standard for the admissibility of expert witnesses is guided by Rule 702 of the Federal Rules of Evidence, which codified Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny, including

-6-

<u>Kuhmo Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 141 (1999). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the fact of the case.

Although <u>Daubert</u> recognized that the evaluation of expert testimony is generally left to juries, the district court functions as a gatekeeper to determine whether a proffered expert qualifies under Rule 702. <u>Daubert</u>, 509 U.S. at 597-98. Although the Rule 702 requirements are treated liberally, "'that does not mean that a witness is an expert simply because he claims to be.'" <u>Pride v. BIC Corp.</u>, 218 F.3d 566, 577 (6th Cir. 2000) (citations omitted). <u>Daubert</u> instructs district courts that their primary function as "gatekeepers" is "to determine whether the principles and methodology underlying the testimony itself are valid"-- not to question the validity of conclusions generated by otherwise valid methods, principles, and reasoning. <u>United States v. Bonds</u>, 12 F.3d 540, 556 (6th Cir. 1993). A party must show, by a "preponderance of proof," that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case. <u>Id.</u> at 592 n.10; <u>see also</u> <u>Kumho</u>, 526 U.S. at 137 ("The trial court ha[s] to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case.").

Although there is no simple test for determining whether a specific methodology is reliable, <u>Daubert</u> outlines several factors that a district court should consider. <u>See</u> <u>Pride v. BIC Corp.</u>, 218 F.3d 566, 577 (6th Cir. 2000). Those factors include whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology,

-7-

and whether the method is generally accepted within the scientific community. Daubert, 509 U.S. at 593-94. If an expert relies solely or primarily on experience, the expert must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. Fed. R. Evid. 702 Advisory Committee's Notes.

Otherwise admissible evidence rendered by experts may go to the ultimate issue to be decided by the trier of fact, but the opinion cannot be a legal conclusion that does nothing but tell the jury what result to reach. Fed. R. Evid. 704(a) ("testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact"); see also United States v. Brawner, 173 F.3d 966, 970 (6th Cir. 1999).

### 1. Expert Testimony of Kraft

Kraft is the principal of a consulting firm that provides tax preparation assistance and consultation in federal income and excise taxes. Defendant tendered Kraft as a "tire industry expert," offering the opinion that the Tire is a "dual purpose, special service, on-off highway tire." The Government asserts that Kraft can help explain the import of tire design attributes, tire markings, tire marketing, actual use of the Tire, regulatory and legal factors affecting taxability, and the import of the Tire's 50 mph speed limit.

Defendant asserts that Kraft is qualified based on his relevant experience working with the IRS and as a consultant for the tire industry. Kraft was employed as an IRS agent from 1967-2003, where he "conducted and/or assisted in the examination of nearly every major tire manufacturer and importer of tires in the United States," a major component of which revolved

-8-

around the "proper classification of tires by the type, grade, tread design, and size was a major component of the examinations of the examination." Kraft conducted tire tax law and auditing training techniques classes for other agents. In 1997, the IRS established the excise industry specialist program. Kraft was selected as an Excise Industry Specialist ("EIS"), and was also named a team leader for tire technicians. Part of his responsibility as an EIS for tire tax was to provide technical and procedural assistance to the excise tax agents in the field during their examinations to enhance their ability to conduct proper and appropriate examinations. In addition, from 1984-2003, he conducted the annual Rubber Manufacturer Association's review of all tire weights and production data, which required analyzing tire size, grade, special design features, type, ply and belt constructions, and tread design. The Rubber Manufacturer's Association is an industry association of which all tire manufacturers, including Bridgestone, are members. Finally, Kraft participated in IRS surveys regarding the Tire use, and helped author the IRS's written decision on the Tire.

Bridgestone seeks to exclude Kraft's testimony, arguing that he is not qualified to give opinions on tire and truck design, that his opinions are improper legal opinions that go to the ultimate issue in the case, and that his testimony is irrelevant. The Court finds Bridgestone's arguments are without merit. First, Kraft's extensive experience comparing tire applications and designs, making tax determinations of other tires, and working with the Rubber Manufacturer Association, render him qualified to tender the opinion that the Tire is a "dual purpose, special service, on-off highway tire." Defendant has further demonstrated that his experience was reliably applied to the facts in this case. Kraft relied not only on his experience, he looked at the tire design features, tire marketing materials, and legal or regulatory issues surrounding tires.

-9-

Second, the Court does not find that Kraft's opinion is a legal conclusion that does nothing but tell the Court what conclusion to reach. The Court found in its August 2004 Order that there are questions of material fact to which Kraft can testify. There, the Court concluded that the disagreements Kraft articulated with Plaintiff's factual conclusions are sufficient to create a factual issue, particularly with respect to the import of the 50 mph restriction. Third, Kraft's testimony is clearly relevant to the import of the Tire's design and use features, how it compares to other tires, and ultimately the issue of whether the Tire's design and use render it of the type used on highway vehicles. Plaintiff's motion is DENIED and Kraft's testimony is admitted and considered by the Court.

### 2. Expert Testimony of Pigman

Pigman is a research engineer for the Kentucky Department of Transportation and serves as the Program Manager for Traffic and Safety at the University of Kentucky Transportation Center. Defendant tendered Pigman as an expert "in the overall transportation of coal in Eastern Kentucky and the type of vehicles used for the transportation of coal in Eastern Kentucky." The Government submits that his experience and extensive knowledge of the types of vehicles upon which the Tire is mounted will be useful and will support Pigman's opinion that "nearly all vehicles, and specifically the single unit three axle vehicles, are being used as both on-road and off-road vehicles in the transportation of coal in eastern Kentucky."

Plaintiff's bases for exclusion are that Pigman is not qualified, his opinions are irrelevant, and his methods are unreliable. The Court finds each of Bridgestone's arguments without merit. The Court finds that Pigman is qualified and has reliable methods. He holds both a bachelor's

degree and master's degree in civil engineering from the University of Kentucky, with an area of focus in transportation engineering. While most of his work appears to be related to accident reconstruction for passenger cars, he has also conducted an evaluation of the safety and economic impacts of the Extended-Weight Coal Haul Road System in the eastern Kentucky region. The Court finds that Pigman's experience studying the coal mining operations and transportation in eastern Kentucky, coupled with his observations in connection to this case, render him qualified to offer his ultimate opinion. As to his methodology, the Court can draw the appropriate inferences based on the fact that Pigman's observations in connection with this case lasted one day.

Finally, the Court finds Pigman's testimony relevant. As the August 2004 Order noted, Pigman's testimony helped to create a genuine issue of material fact as to the extent of the Tire's use in coal-mining operations in Eastern Kentucky and whether trucks hauling coal in Eastern Kentucky were operating both on and off-road. His testimony is therefore relevant to resolving those issues. Plaintiff's motion is DENIED and the Court will consider Pigman's testimony.

## III. LEGAL STANDARDS

In a tax refund proceeding, the plaintiff bears the burden of proof and persuasion. See Helvering v. Taylor, 293 U.S. 507, 514 (1935). The plaintiff's burden is "specifically to show not merely that the assessment was erroneous but also the amount to which he is entitled." Id. The plaintiff must rebut the presumption of correctness that attaches to the determination of the IRS. See Sara Lee Corp. v. United States, 29 Fed. Cl. 330, 334 (Ct. Cl. 1993), (citing United States v. Janis, 428 U.S. 433 (1976)). The plaintiff retains these burdens even where the United

-11-

States has asserted a counterclaim. <u>Sinder v. United States</u>, 655 F.2d 729, 731 (6th Cir. 1981).

In this case, Plaintiff bears the burden to prove that the Tire is not subject to a tax under 26 U.S.C. § 4071 for the period of 1995-2000. Although this portion of the tax code has since been amended, effective January 2005, it was applicable from 1995-2000, the relevant time period for this litigation. The provision provides, in relevant part, for a federal excise tax to be imposed "on tires of the type used on highway vehicles, if wholly or in part made of rubber, sold by the manufacturer, producer or importer . . . ." 26 U.S.C. § 4071(a). "Tires of the type used on highway vehicles" are tires used on: (1) motor vehicles which are highway vehicles; or (2) vehicles of the type used in connection with motor vehicles that are highway vehicles. 26 U.S.C. §4072(b). As there is little precedent interpreting this statute, the Court looks to the plain meaning of the statute.

In order to determine whether the Tire is "of the type used" on a highway vehicle, the Court must first contemplate the meaning of a "highway vehicle" within the meaning of the statute. IRS regulations interpreting this section of the tax code, state that a "highway vehicle" is "any self-propelled vehicle, or any trailer or semitrailer, designed to perform a function of transporting a load over public highways, whether or not also designed to perform other functions, but does not include a vehicle described in paragraph (d)(2) of this section." 26 C.F.R. § 48.4061(a)-1(d).[1] Paragraph (d)(2)(ii) of that section provides an exception to the definition of a highway vehicle:

> (ii) Certain vehicles specially designed for off-highway transportation. A self-propelled vehicle, or a trailer or semitrailer, is not a highway vehicle if it is (A) specially designed

---

[1] 26 C.F.R. 48.4072-1(c) of the Manufacturer and Retailers Excise Tax Regulations do not define "highway vehicles" but instead refer to 26 C.F.R. §§ 48.4061(a)-1(d) for the definition.

-12-

for the primary function of transporting a particular type of load other than over the public highway in connection with a construction, manufacturing, processing, farming, mining, drilling, timbering, or operation similar to any one of the foregoing enumerated operations, and (B) if by reason of such special design, the use of such vehicle to transport such load over the public highways is substantially limited or substantially impaired. For purposes of applying the rule of (B) of this subdivision, account may be taken of whether the vehicle may travel at regular highway speeds, requires a special permit for highway use, is overweight, overheight or overwidth for regular use, and any other relevant considerations. Solely for purposes of determinations under this paragraph (d)(2)(ii), where there is affixed to the vehicle equipment used for loading, unloading, storing, vending, handling, processing, preserving, or otherwise caring for a load transported by the vehicle over the public highways, the functions are related to the transportation of a load over the public highways even though such functions may be performed off the public highways.

26 C.F.R. § 48.4061(a)-1(d)(2)(ii). "For purposes of paragraph (d) of this section . . . the term 'public highway' includes any road (whether a Federal highway, State highway, city street, or otherwise) in the United States which is not a private roadway." Id. "Examples of vehicles that are designed to perform a function of transporting a load over the public highways are passenger automobiles, motorcycles, buses and highway-type trucks, truck tractors, trailers, and semi-trailers." Id.

If the Court finds that the Tire is used on "highway vehicles," then there is a presumption that it is "of the type used on highway vehicles." Bridgestone would have a heave burden to show that the Tire was not actually designed or used for highway use. If the Tire is not used on highway vehicles, however, the Court's analysis focuses heavily on the Tire's actual use and its design. Reviewing the tires actual use takes into consideration Congress's intent to "measure the incidence of the tax as closely as is administratively feasible (and no closer) by actual wear and tear on the highways." Great Olympic Tire Co. v. United States, 597 F.2d 449, 451 (5th Cir. 1979) (considering the taxability of tread rubber destroyed in the retreading process). In enacting Section 4071, Congress did not believe that monitoring the degree of highway use was

-13-

a sole practical criteria. Accordingly, courts must look at both the design as well as Congressional intent to inform the decision regarding whether a tire should be excluded from tax as "unsuited for highway service." Id. at 450.

**IV. DISCUSSION**

### A. Highway Vehicles

As laid out above, to determine if the Tire is of the type used on highway vehicles, the Court first examines "highway vehicles" and the exceptions thereto before deciding whether the Tire is of the type used by a highway vehicle. In the present case there was no evidence that the Tire came standard on any vehicle. The only testimony on this point was that the Tire must be special-ordered for vehicles that are then considered customized vehicles. As a result, it would appear that the Court should first identify each vehicle for which the Tire is typically ordered, then determine if those vehicles, with the Tire attached, are "highway vehicles." However, as explained more fully below, there is insufficient evidence as to what kinds of vehicles the Tire is used on.

While there was evidence that the Tire was used on many different kinds of vehicles, evidence about the function, use and design of those vehicles was markedly scarce. Even though there was a significant amount of testimony concerning the vehicles that the Tire was used on in eastern Kentucky, the Court finds that Eastern Kentucky usage is not a representative sample. According to Kimberly Malone ("Malone"), an IRS Tire Excise Issue Specialist Team Member, the sales information provided to the IRS by Bridgestone indicated that 46% of sales of the Tire went to one particular dealer in Eastern Kentucky. That leaves over half of the Tires to be sold

-14-

and utilized elsewhere. Defendant's own expert stated that after a review of the information provided by Bridgestone about the Tire's customers, he was unable to identify the "type, model of trucks or tractors, or information concerning any substantial modifications made to the vehicles" for Bridgestone's largest customers. Without this information, Kraft was unable to determine if the vehicles were "highway vehicles" within the meaning of the regulation.

Likewise, the Court is unable to make this determination based upon the limited information submitted into evidence at trial. This very lack of testimony as to the vehicles themselves weighs in favor of finding that the design of the Tire itself helps to determine the use of the vehicle, including whether it is a "highway vehicle" within the meaning of Section 4071.

If the Court were to apply the regulatory definition of highway vehicle, looking at the (scarce) evidence of the Tire as a part of the vehicle, the Court finds that the Tire is of the type used on an non-highway vehicle. First, the trucks in the all of the surveys fit within the exception, as they are designed for such off-highway operations as mining and timbering; these trucks are customized per the customer's preference and according to the chosen application of the vehicle. According to Guy Walenga ("Walenga"), Bridgestone's Engineering Manager for North American Products, the design of trucks is almost always customized and a truck customer must specify almost all of the components that she requires given the desired application of the truck. The Tire is not standard equipment on the Mack 600 or 800 trucks (the trucks observed by the IRS in Eastern Kentucky), and must be specially ordered, based on the customer's desired application. Because the design of the truck cannot be analyzed without taking into account the design of the tires that are mounted to it, once the Tire is specially ordered for these trucks, the truck has become "specially designed for the primary function of transporting a particular type of

-15-

load other than over the public highway in connection with a . . . mining, drilling or timbering operation." 26 C.F.R. § 48.4061(a)-1(d)(2)(ii)(A).

Second, the vehicles to which the Tires are mounted are "substantially impaired" in transporting a load over the public highway, which meets the second criteria. Kraft's expert report indicates that "almost all of the Bridgestone [survey] respondents operated trucks and tractor-trailers in off-highway . . . operations, [and] the vehicles were operated on private property and were not registered for the highway." As to those in Kentucky, the evidence shows that trucks using the Tire when fully loaded do not exceed 30 mph when using this Tire and possess special permits. Many of the users in Bridgestone's survey identified their trucks and tractor/trailers as not being taxable and indicated that their gross vehicle weights ranged from 90,000 pounds to 160,000 pounds. In fact, all of the trucks in Plaintiff's second survey were overweight and could not operate at regular highway speeds. Moreover, several users indicated that they did not even have license plates, a requirement these trucks did not need to fulfill given that they did not operate on the highway. The NHS mark may have further impaired a truck's ability to pass inspection, depending on which axle it was positioned on. All of these factors combine to make vehicles using this Tire substantially impaired for highway use, thus falling within the exception to the definition of highway vehicle.

In this case, due to insufficient data, the Court cannot analyze the use of the vehicle independent of the Tire. As such, if the design and predominant function of the Tire is off-road, it is not necessary to examine and apply the definition of highway vehicle and its exceptions, because the design of the Tire dictates the use of the vehicle. As a result, the Court finds it is more efficient in this case to direct attention to the Tire's actual design features and actual use in

-16-

a manner that is consistent with Congress's intent. The Court heard testimony on the multiple factors that will determine the taxability of the Tire and will decide the predominate use of the Tire by reviewing these factors, which include: (1) the design of the Tire, including the Tire's tread depth, tread pattern, rubber-to-void ratio, speed and time restrictions, cap compound, radius, sidewall markings, and the vehicles to which the Tire is attached; and (2) the marketing of the Tire. For the reasons set forth below, the Court finds that, considered in their entirety, these factors lead to the conclusion that the Tire is not of the type used on highway vehicles.

### B.     Actual Use of the Tire

The Court heard testimony from both parties as to the predominant function of the Tire. The parties dispute both the Tire's ratio of on-highway use to off-highway use and the extent of the Tire's use in areas of ongoing coal hauling operations.

### 1.     *Eastern Kentucky Usage and IRS Survey*

Defendant limits its analysis of the Tire's on-highway use to coal trucks in Eastern Kentucky. Malone, the IRS EIS team member who was assigned to the case team that conducted the second audit of the Tire, testified that sales information provided to the IRS by Bridgestone indicated that 46% of sales of the Tire went to one particular dealer in eastern Kentucky. This information prompted the IRS to focus its investigation of the Tire in the Kentucky coal region.

-17-

Pigman, Defendant's expert, testified that, Eastern Kentucky's coal transportation system was unique. Pigman explained that The Extended Weight Coal Haul Road System is a 3000-mile system of roadways in of Kentucky. Under the system, a permit or decal is required for any truck hauling loads in excess of the legal limit of 80,000 pounds on designated roads. The system applies to single unit three-axle trucks, single unit four-axle trucks, and tractor-trailer trucks that are five, six, or seven axles.

Pigman testified that in the typical coal extraction process, coal is first extracted from coal mining sites, then transported to a processing facility, where it is processed and washed, and subsequently transported to a tipple facility. At the tipple, the coal is usually dropped into a railroad coal car for further transport, but it may also be loaded onto larger tractor-trailer trucks. According to Pigman, the transportation of coal in Eastern Kentucky from the extraction point to the processing facility, and then to the tipple, is "done with truck, almost exclusively." The coal extraction points and processing facilities and/or tipples are always off-road. A few coal companies with a very large permanent mine facility have processing facilities and/or a tipple off-highway close to the extraction point. However, according to Pigman, the coal is "almost always, in a very, much more than a majority, much more than 50 percent of the time" transported from the point of extraction to the processing facility and/or tipple in a truck over a public state or federal highway. He testified that the vehicle that hauls the coal from the extraction point is the same vehicle that travels over the public highways, and "in many cases," the vehicle is a three or four axle vehicle. Other times, it will be a tractor-trailer vehicle. Typically, after the coal is unloaded at the processing facility and/or tipple, the vehicle returns to the mine extraction facility to pick up another load using the public highways. Pigman

-18-

ultimately opined that nearly all vehicles, specifically the single unit three axle vehicles, are being used as both on-road and off-road vehicles in the transportation of coal in Eastern Kentucky.

On June 15-17, 1999, as part of the audit, the IRS conducted a survey of the Tire's use in Eastern Kentucky. The IRS survey team consisted of Malone, Kraft, Scoville, and Robert Cirelli, Team Coordinator – Retail Tax Issue Specialist Team, as well as Kentucky Motor Vehicle Enforcement Officers Green, and Jack Haley. Officer Green chose four locations and during the survey, flagged down the trucks to submit to inspection. In conducting the survey, the IRS collected various information including company information, D.O.T. or Kentucky numbers identifying the truck, each truck's make, model, vehicle identification number, and the registration type. The IRS also noted the make, model, and number of each tire on the trucks inspected. Finally, the IRS asked questions of the truck drivers, including the miles they traveled on and off the highway, and the number of trips they made per day and per week.

As to truck type, Green observed three types of trucks using the Tire: coal trucks, logging trucks, and heavy equipment trucks. The majority were coal trucks, typically ten-wheel trucks. Green stated that coal trucks and logging trucks are essentially the same vehicles, with different rears. Pigman testified that the types of vehicles used to transport coal are three or four axle dump trucks and tractor-trailer combination trucks. Malone testified that the vast majority of the trucks she observed on the public highway, parked at highway rest stops, and parked at truck stops in Eastern Kentucky were Mack 800 series coal trucks.

Green offered testimony as to his general observations of truck usage on the highways. Green stated that "probably less than ten percent" of coal operations are done completely off-

-19-

highway. According to Green, when used in making the "coal run," the typical truck shuttles back and forth from the mine to the tipple, a twenty-five mile one-way trip on the highway. More specifically, Green testified that at the first inspection site, one group of trucks would have traveled five to seven miles each way, another group would have traveled twelve to fifteen miles each way, and a third group would have traveled four miles each way. Green testified that the second inspection site requires some trucks to travel eighteen to twenty miles and others six to eight miles each way.

The inspectors made note of truck speed and the highway speed limits. Green testified that at three of the inspection sites, the speed limit is 55 mph, while at the fourth it is between 45 and 55 mph. Green testified that when fully loaded, the ten-wheel truck could drive approximately 20 to 30 mph, although sometimes this figure would be reduced to 5 or 10 mph. When empty and returning from the tipple back to the mine, however, Green observed that the trucks will run anywhere from 45 to 60 mph. Malone also observed coal trucks traveling on the public highway and driving at regular highway speeds, estimated at 50 to 55 mph.

Altogether, at the four locations observed during the one-day survey in Kentucky, the IRS observed 24 trucks, and a total of 240 tires. Of the 240 tires observed, 37 tires were the Tire. Relying on the information collected in the survey, including miles traveled on and off highway, Defendant calculated that the Tire was used 71% on-highway. This calculation is based on distance traveled on the highway, as opposed to time spent on the highway.

-20-

### 2.    *The Bridgestone Surveys*

To the contrary, Bridgestone asserts that the Tire is used off-highway approximately 97% of the time. Walenga testified that Bridgestone conducted two customer surveys as to actual use of the Tire. Bridgestone's largest customers, representing the mining, logging, and oil industries were surveyed. Bridgestone surveyed its customers according to actual time the Tire spent on the highway, as opposed to distance traveled on the highway because, according to Walenga, on-highway time is the relevant criteria for usage according to industry practice.

The first survey covered approximately 1500 Tires and showed off-highway usage 96.7% of the time. Most users reported 100% off-highway usage, except for two users in West Virginia reporting 88% and 96% off-highway usage, a user in Maine reporting 90% off-highway usage, and a user from the Southeast reporting 85% off-highway usage. The second survey covered Tires purchased by ten customers in states including West Virginia, Alaska, and Kentucky. All of the customers, except one in Kentucky, reported operating off-highway 100% of the time, while the Kentucky customer reported operating off-highway 70% of the time. The survey concluded that overall the Tire was used off-highway approximately 97% of the time, as measured in actual time.

Thomas Giapponi ("Giapponi") was tendered as an expert in truck tire design and the standards that apply to truck tire design. Giapponi is the principal of TRGtech Tire Consulting, a tire-consulting firm, is a licensed professional engineer, and has worked in the tire industry for over twenty years. After review of the Tire, Giapponi opined that "based on [the Tire's] composition, construction, and sidewall markings," the Tire is an "off-the-road design tire." He testified that his definition of an off-highway tire includes some on-road use. When testifying as

-21-

to Bridgestone's survey results, Giapponi stated that he is aware that the Tire is actually being used on the highway on vehicles used to transport coal from the mine source, over the public highway, off the highway, and to the tipple. Giapponi is also aware that the Tire is mounted on vehicles that return over the public highway to the original mineshaft, reload, and repeat the hauling process. Giapponi testified that even under these circumstances, the Tire is entirely and exclusively an off-highway tire based on its design features and marketing. He testified, "this is the way a lot of off-road tires are used, but that the Tire's Not for Highway Service makes it not for highway service," although "some intermittent highway speed happens."

### 3. Analysis

The issue is whether the predominant function of the Tire is on-highway or off-highway. The Defendant advocates that the predominant function of the Tire is on-highway because after a one day survey in Eastern Kentucky, where 46% of the Tires are sold, the Defendant concluded that for 71% of the miles traveled, the Tire was on a highway. Bridgestone, however, asserts that after reviewing surveys taken across the country by Bridgestone's largest customers, the Tire spent 97% of its driving time off a highway.

Bridgestone urges the Court to only consider actual time spent on the highway, rather than distance traveled, arguing that this conclusion is consistent with that made in Gateway Equipment, Corp. v. United States, 247 F.Supp.2d 299 (W.D.N.Y. 2003). In that case, when considering whether a vehicle constituted a "highway vehicle," the court found that "[t]he question is whether . . . the vehicles spend 'most of their functional time off the highway performing tasks unrelated to highway transportation.'" Id. at 314 (internal citations omitted).

-22-

The Gateway court found that trucks that spent 66% of their time off-road functioned predominantly off-road. There, the court found instructive the decision in Haliburton v. United States, 611 F. Supp. 1118 (N.D. Tex. 1985), where the evidence showed that the average distance to and from the job site was 90 miles round trip with a significant portion of the distance traveled on public highways. Nonetheless, the court found that because two-thirds of the trucks' time was spent at the job site and one-third was spent in transit, the trucks were predominantly used for an off-highway function. Id. at 314 (citing Haliburton, 611 F. Supp. at 1120-21).

The Court finds that both time on the highway and distance traveled contribute to actual wear and tear of the public roadways, and using both is most consistent with Congress's intent to tax such actual wear and tear. See Great Olympic, 597 F.2d at 451. Moreover, the Tire and Rim Association Standard governing "mining and logging tires used in intermittent highway service" takes into account highway speed. As speed is a function of both time and distance, among other factors, this industry standard supports the Court's decision that both time on the highway and distance traveled are relevant. Accordingly, the Court utilizes the information gathered in both the Government's and Bridgestone's surveys when coming to conclusions as to predominant function and the actual use of the Tire.

The Court finds that the Tire is predominately used off-highway. According to the Bridgestone surveys, which covered 1500 Tires, overall the Tire was used off-highway approximately 97% of the time. Nevertheless, the survey did indicate that the Tire was used on-highway by users in Kentucky, Maine, West Virginia, and in at least one area of the Southeast. In contrast, the Government only presented evidence about the Tire's use in Eastern Kentucky, and extrapolated its conclusion after seeing only 37 Tires. While the fact that 46% of the Tires

-23-

were sold to one dealer in Kentucky and the survey revealed that 15% of the tires seen in the survey were the Tire and were used on the highway is persuasive for the Tire's use in Eastern Kentucky, it is not enough for this Court to find that all the Tire's are used on-highway. Moreover, with respect to Eastern Kentucky, the users of the vehicles were aware, or should have been aware, that highway use of the Tire was improper. Officer Green made drivers aware that this was not a Tire to be used on the highway. The Kentucky based tire dealer told Green that no excise tax was being charged on the Tire, so it was not to be used on the highway. Furthermore, the NHS marking should have alerted drivers to this fact.

While the Tire appears to have been used both on- and off-highway, the predominant usage – when considering both time and distance traveled, across the regions where the Tire was sold – was off-highway. For these reasons, the actual usage of the Tire weighs in favor of finding that the Tire was not of the type used on highway vehicles.

### C. Design of Tire

The Court also heard testimony from both parties as to the predominate design of the Tire. The parties dispute the import of many of the Tire's design features, as well as the import of the Tire's marketing and industry classifications.

#### 1. Tread Depth and Pattern, Rubber-to-Void Ratio, Cap Compound, and Tire Radius

Walenga and Giapponi both testified on Bridgestone's behalf that Tire is designed for off-road use. First, they testified as to the Tire's tread depth and lug design. Walenga testified

-24-

that the tire has a tread depth of 39/32 of an inch, while the seven other tires in Bridgestone's L317 line, each of which are taxed for on-highway use, have a shallower tread depth of 31/32 of an inch. Walenga stated that the deep tread depth and tread design allow the Tire to go off-road "into very aggressive areas" such as soft soil, hard soil, and rocks, as well as protect the Tire casing from damage while it is used off-road. Giapponi testified that he conducted some general research on the tread depths of all on and off-road tires and found that tread depths vary from 18/32 to a maximum of 33/32 of an inch, and that "there is nothing in between" those tires and the Tire.

Kraft, Defendant's expert, also testified about the Tire's design features. He agreed that the Tire's tread depth allows it to withstand and work well under off-road conditions involving clay, sand, mud and rocks, but noted that this conclusion necessarily depends on the load size. He testified that a smaller tire carrying a lighter load than the Tire carries would not necessarily need as deep a tread. The fact that a smaller tire with a lighter load can perform the same work as the Tire is irrelevant for purposes of determining whether the Tire is designed to perform off-road. Moreover, Defendant's own survey supports the fact that this Tire is used in the coal industry to carry heave loads off-road.

Second, according to Bridgestone, several aspects of the Tire's tread pattern are indicative of an off-road design. Giapponi testified that, first, the side angles of the Tire – which measure between 28 and 32 degrees – are approximately double the design criteria for off-road tires that, in Giapponi's experience, are normally 15 degrees. Giapponi stated that the steeper the side angle, the more support a tire's "blocks," a feature of the tire, have for off-road traction. Second, the Tire lacks any siping, slits located inside the blocks, in its tread. Giapponi testified

that this is a feature consistent with an off-road design because it prevents rocks and gravel, typical of off-road terrain, from drilling down into tires and damaging them. Conversely, on-road designed tires normally contain siping in order to improve traction on hard, wet surfaces, and to reduce noise. Third, Giapponi testified that the three-block tread pattern of the Tire is a traction pattern, as opposed to a rib pattern, that is for use on a front or rear drive axle. Giapponi testified that this pattern has comparatively large blocks so that the tread does not tear off under load when used off-road.

Third, Bridgestone argues that the Tire's rubber-to-void ratio indicates that it is an off-highway tire. A tire's rubber-to-void ratio, or amount of surface rubber that comes in contact with the road, is for traction. The Tire's surface is 49% rubber and 51% void. In comparison, Giapponi stated that a regular "all season" tire on a passenger car is about 70% rubber, while a race car tire is almost 100% rubber. Giapponi testified that this feature of the Tire makes it designed for greater traction off-road, because a tire with more void than rubber, will wear faster on-road, will have worse irregular wear, and will exhibit greater noise on-road. Kraft agreed that the Tire's rubber to void ratio makes it better suited for off-road than on-road use, than a Tire with less void.

Next, Bridgestone argues the Tire's cap compound is designed to be cut, chip and tear resistant, making it better suited for off-road than on-road use. Giapponi stated that the Tire has a "cut and chip resistant tread chemical composition," which is found in off-road tires. Giapponi further stated that one does not use "that compound on-road because it is a hot running compound, and you don't need that." Kraft stated that he does not dispute that the compound is

-26-

as Bridgestone describes it. However, Kraft states that on-off-highway tires also share the same compound, because they are used, in part, off-road.

Bridgestone also argues that the Tire's inflated tread radius is indicative of an off-road design. Tread radius was described by Giapponi as follows: "If you take this tire and put it on a wheel, put 120 pounds per square inch into it, the tire will crown in a convex way. And that is the inflated tread radius." Giapponi testified that the Tire's inflated tread radius measures approximately 22.8 inches. He stated that when he designed tires, a tread radius of less than approximately 25 inches was the design criteria for an off-road tire, such that "less than 25 inches makes it more off-road [while] greater than 25 makes it more on-road." He concluded that the Tire's tread radius gives it "off-road capability." Kraft agreed that the Tire's inflated tread radius would make it unsuitable for long-term on-road use, but that the Competing Tires are comparable based on their tire designs, patterns and construction. The dimensions, load ranges, sizes, tread depths, void ratios, and blocks of the Competing Tires are essentially the same as those of the Tire. Kraft stated that the Competing Tires are both on-off highway tires.

While the Court finds Kraft's testimony on these characteristics persuasive and credible, the Court finds that each of the characteristics described makes the Tire better suited for off-road use than on-road use. Indeed, Kraft agreed when he stated that the Tires "have to be of this structure to perform off-road, and to haul the coal." While these characteristics also make the Tire very well suited for off-highway use with intermittent highway or road use, the overall design features weigh more heavily in favor of a finding of off-highway design.

## 2. Speed and Time Restrictions

Next, Bridgestone argues that the Tire's speed restriction makes it designed for off-highway use. The Tire is marketed with a speed restriction of 50 mph. The Tire also has a time restriction – it cannot be continuously operated on-road at 50 miles per hour for more than one hour. Other tires in the L317 series have a rated top speed of 55 miles per hour, and according to Walenga, can operate at this speed on or off the highway.

Walenga testified that if the Tire were to travel on a road at 50 mph, the heat build up would begin to degrade the components of the tire, underneath the tread, in approximately one hour of continuous service. Giapponi testified that exceeding the Tire's speed and time restrictions on-road would result in a belt-to-belt separation, or, in other words, the "ultimate failure of the tire." Officer Green testified that in his experience observing and inspecting coal trucks, when these trucks attempted to haul coal 65 to 70 miles each way, "they had a lot of tire failure."

Kraft concurred that a deep lug tread and a large void area will contribute to heat buildup when driven on a road, which will destroy tires and treads. Malone also stated that a 50 mph limit is not typical of highway tires. Kraft also testified, however:

> I find nothing in that [50 mph] speed limit that restricts these tires in this setting, in Eastern Kentucky, and now in West Virginia, that would stop them from performing their function. In other words, they have to be of this structure to perform off-road, and to haul the coal. To assume that the tire would have to operate theoretically at 65 miles an hour on some highways, where they are not utilized, you know, they make tires for that. If we need to haul the coal in a tractor-trailer for some long distance, you use a different tire. But if you're in Eastern Kentucky and West Virginia, and you need to haul coal out of the mountains and across the roads and down to the tipple, you need this tire.

-28-

Kraft further testified that he did not believe that the 50 mph speed limit, in itself, determines whether the tire is an off-highway tire. He testified that other tires such as the Bridgestone Z-Lug tire, as well as the Competing Tires, are also speed rated at 50 mph and are taxable tires. In fact, in his report, Kraft stated that the fact that the Tire is capable of carrying such heavy loads at 50 mph for up to one hour "sets it apart from typical Off-The-Road tires [sic]. Typical [off-road] tires are designed to operate at much lower speeds and to travel short distances." In fact, the IRS survey summary notes that lighter duty trucks equipped with smaller size L317 tires could not successfully compete because economics requires the use of trucks carrying these heavier loads on and off highway.

While the 50 mph speed restriction certainly limits the Tire's ability to operate on a highway, or on a highway vehicle, it does not preclude the Tire from some on-highway usage. Nevertheless, the other significant characteristics favor a finding that the Tire is designed for off-highway use.

### 3. *Tire Sidewall Markings*

The Tire was originally was manufactured with the letters D.O.T. ("Department of Transportation") appearing before the serial number on the Tire's sidewall. After the first IRS audit, during which time the IRS expressed its concerned that the D.O.T. marking represented intent to use the Tire on the highway, Bridgestone changed the sidewall markings. At Bridgestone, a new product or change to a product line requires a New Product Authorization ("NPA"). In April 1995, Bridgestone issued a NPA that, among other things, removed the

-29-

D.O.T. mark from the Tire and added sidewall plates stating "Not for Highway Service." The NPA reads, in relevant part:

> Until recently, all manufacturers of 12.00R24 tires have followed similar policies of not paying or collecting F.E.T. [federal excise tax] on tires of that size. There were two considerations that led all manufacturers to follow the same policies: (1) Their intent was for 12.00R2 tires to be used only in off-road applications or on private roads (coal hauling, logging, mining). (2) Since the F.E.T. on a 12.00R24 would be a large tax – more than $50/tire – its collection would put one brand at a significant price disadvantage versus others if it was included. . . . The IRS has now challenged [Bridgestone] on this subject. Prior to their challenge they contacted dealers and obtained information indicating that, at least in some operations, some users were driving [the Tire] on public roads for at least a portion of the usage. Additionally, they pointed out the fact that our tires have D.O.T. on the sidewalls giving the appearance that they are approved for highway usage.

The NPA went on to state that Bridgestone found it was necessary to begin immediately paying taxes on two of its other 12.00R24 tires, and, with respect to the Tire, "begin immediately to revise the sidewalls of to provide a better indication that this tire is intended solely for use in off-road services. We will not pay/collect F.E.T. tax on [the Tire]."

The Court takes notice that the NPA also contains a section called "Positioning," in which it states, "An off-highway, drive axle tire intended for a variety of haul truck services. Positioned against the Goodyear G177 and Michelin XDL." Under a section entitled "Remarks," the NPA lists the sidewall information on these competing tires. As to the Michelin XDL, part of the sidewall information is: "FOR DOT TEST AND NORMAL HIGHWAY USE IN NORTH AMERICA AND AUSTRALIA." Likewise, the sidewall information on the Goodyear G177 shows a D.O.T. marking preceding a serial number.

Walenga testified that in order to qualify for a D.O.T. mark, the Tire was tested to determine that it was safe to operate on the highway. Walenga testified that the D.O.T. mark

-30-

indicates that the Tire "went through testing that it really didn't need to go through," Bridgestone considered the D.O.T. mark "a mark of tire quality." Walenga stated that the D.O.T. mark means that the Tire "can be legally used on highways in the United States."

There were several regulations in place during the 1995-2000 period concerning sidewall markings. A National Highway Traffic Safety Administration ("NHTSA") regulation concerning "[s]pecial purpose tires," states, "[t]ires marked 'Not for Highway Use' or . . . other such restriction shall not be used on any motor vehicles operating on public highways." 49 C.F.R. § 570.62. A second NHTSA regulation requires tires "designed for highway use" to contain a D.O.T. mark. 49 C.F.R. § 571.119. The Federal Motor Carrier Safety Administration ("FMCSA") has further promulgated a regulation that commercial motor vehicles pass periodic inspections in order to be used on the highway, and that vehicles marked NHS would not pass inspection. See 49 C.F.R. § 396.17, App. G.

Giapponi testified that changing the sidewall markings on a tire from D.O.T. to NHS alone converts it from an on-highway tire to an off-highway tire. To the contrary, Kraft testified that since the FMCSA regulation states that it is illegal for a vehicle without a D.O.T. number to operate on the highway, the "dilemma" arises as to how is it that the Tire is permitted to operate on the highway. Kraft stated that, based on the inspection or certification criteria applied by the FMCSA enforcement personnel, the regulation applies only to tires mounted on the steering (front) axle of the vehicle, not to tires mounted on the drive (rear) axle of the vehicle. Therefore, Kraft argues, it would not be illegal to drive on the highway with an NHS marked tire if it is mounted on the rear of the vehicle.

-31-

The Court finds that Bridgestone's decision to remove the D.O.T. marking and add the NHS marking was an attempt to clarify the Tire's classification both for consumers and the IRS, and that Bridgestone chose to mark the Tire based on applicable regulations governing off-highway tires. The fact that FMCSA criteria permit off-highway tires to be used on rear axle's of vehicles driven on highways suggests a recognition by FMCSA that off-highway tires are sometimes used on-highway. That FMCSA permits some on-highway use of off-highway tires does not suggest that those off-highway tires are subject to the excise tax. Accordingly, this design attribute weighs heavily in favor of finding it is not of the type used on highway vehicles.

### 4. Tire Marketing and Industry Classifications

Finally, the Court considers testimony concerning the Tire's marketing by both Bridgestone and the tire industry. First, Bridgestone's Confidential Dealer Net Billing Price List for truck and bus radial tires, effective October 1, 1991, listed the Tire with a footnote indicating "Off Highway Application."

Second, in the Bridgestone Heavy/Light Truck Data Book, effective January 1994, the L317 series of tires is in a section entitled "Radial Truck Tires - Conventional (On/Off Highway Service)." On page 67, there is a L317 listing with a drawing of a tire and the description: "A deep tread on/off highway lug design for use on drive axle." On page 72, there is a table titled "Recommended Applications," in which the L317 is listed as "On Off Road Service." Each of these listings appears to refer to the L317 series as a whole. On page 84, however, in another table charting the design characteristics of Bridgestone Tires by type, there is a category called "L317 On/Off Highway." Nine tires are individually listed in that table, and there are two

-32-

footnotes next to the Tire's listing. One reads "Intended for offroad use only," and the other reads, "Maximum operating speed is 50 mph."

Third, in Bridgestone's Medium and Light Truck Tire Price and Data Book, effective July 1996, there is a page entitled "L317 Deep Tread On/Off Highway Drive Axle Radials." The Tire is listed separately on this page from the other tires in the L317 series as "L317 Off-Highway Application-Not for Highway Service." There is a footnote as well indicating "Off highway application - 50 mph maximum operating speed." This is the only tire data book from the 1995-2000 period in evidence. This book also advertises that the Tire is comparable to Goodyear G177 and the Michelin XDL by stating that these tires are comparable tires that perform the same function.

Fourth, The Goodyear Commercial Products Base List Prices guide, effective January 1, 2001 reflects that, as of January 1, 2001, Goodyear is collecting federal excise tax on the G177 tire of $76.23 per tire. This guide categorizes the Tire as a "Commercial Radial Truck Tire," indicated as "special service." All of the tires in this category, except the G177 tire, are described as on-off road tires, and there is a notation on this page that the Tire is intended for off-highway use only. That guide further describes the G177 as a "severe service drive axle radial designed for the most rugged off-road conditions such as coal fields. Excellent off-road traction and durability." The Michelin Base Price guide, effective January 1, 2001 reflects that Michelin is collecting federal excise tax on the Michelin XDL tire of $69.68 per tire. The guide describes the tires as "The drive-axle traction radial truck tire engineered primarily for off-road conditions."

-33-

The Government entered into evidence another publication, the 1993 Tread Design Guide, a tire industry guide published by the National Tire Dealers and Retreaders Association, a national organization of approximately 4500 independent dealers. This industry guide classifies the Tire and the Competing Tires as "medium and large highway truck tires." The Court notes that this listing also has a footnote indicating "highway special service," and that the listing refers to the entire series of Bridgestone L317 tires, not only the Tire.

Bridgestone offered The Tire and Rim Association Yearbook, which includes an off-road section that lists in its index certain trucks, including mining and logging trucks. This resource also contains a speed restriction table for tires used on these trucks. That table, which includes tires sized at 12.0024 like the Tire, restricts the speed of mining and logging tires to a maximum 50 mph, and indicates that mining and logging tires "are not intended for sustained highway service." However, the Court takes notice that this resource also classifies these same "Mining and Logging Trucks" as for "Intermittent Highway Service."

As to the Tire's marketing and industry classifications, the Court does not weigh as heavily those listings that occurred prior to the 1999-2000 audit cycle. Not only did those classifications occur before the time period for liability in this case, the Tire at that time had sidewall markings, which may have influenced the industry classifications in particular. Bearing that in mind, the Court finds that to the extent that on-off road tires or special/dual purpose tires are taxable as tires of the type used on highway vehicles, the Tire's classification with such tires is both confusing and suspicious. However, each Bridgestone and industry listing after 1994 had a clear notation of both the speed restriction and that the Tire was not for highway service. Therefore, the Court finds that the marketing of the Tire weighs in favor of finding that the Tire

-34-

was not of the type used on highway vehicles.

## IV.  CONCLUSION

Analysis of actual use of the Tire and its design lead to the conclusion that the Tire is not of the type used on a highway vehicle.  The Tire is certainly capable of serving in a limited capacity on an improved surface; however, this could include either a private or public roadway. In fact, the Court finds that there are many applications for such a Tire that would not require it to be used on a public highway, such as in oil, mining, and/or logging operations that require short-term on-road use and significant off-road use, and have private roadways.

However, there is simply not enough evidence to conclude that the Tire is designed to be part of a highway vehicle.  Neither is there sufficient evidence to conclude the Tire is actually used as a part of highway vehicles.  Incidental highway use in certain regions of the country on less than 50% of the Tire in predominantly off-road operations does not make the Tire "used" on highway vehicles.  The Court had concluded that when deciding if the Tire is "of the type" used on highway vehicles, the Tire must be considered as part of the vehicle to which it is attached. As the Tire in its application is neither designed to be part of a highway vehicle, nor used as part of a highway vehicle, the Tire is not "of the type used on highway vehicles."

Even applying the regulatory definition of highway vehicle, using the scant evidence available of the Tire as part of a vehicle, the Court cannot conclude that the Tire is of the type used on highway vehicle.  The Tire does not come standard on any vehicle, and therefore customizes any vehicle it is put on to make it more likely an off-road vehicle, which is "substantially impaired" in transporting a load over the public highways.

-35-

For the reasons herein, the Court hereby ORDERS Defendant to refund to Bridgestone the $92,792.83 in federal excise tax and interest erroneously and illegally assessed and collected for the January 1, 1996 to March 31, 1996 tax quarter and to pay interest, both prejudgment and postjudgment, on this amount. It further orders judgment in favor of Bridgestone on the Defendant's counterclaim for the $1,591,378 erroneously and illegally assessed for the four quarters of 1995, the second through fourth quarters of 1996, the four quarters of 1997, 1998, 1999, and the first quarter of 2000.

It is so ORDERED.

Entered this the _22nd_ day of _____March_____, 2006.

_____

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT